---

RYAN v. OHMER.

(Circuit Court of Appeals, Second Circuit. May 31, 1917.)

No. 233.

1. EVIDENCE ⊚�613441(1)—PAROL EVIDENCE—ORAL NEGOTIATIONS.
The execution of a written contract supersedes and merges all oral negotiations or stipulations concerning its terms.

2. CONTRACTS ⊚�613147(1)—CONSTRUCTION—INTENTION OF PARTIES.
The intent of the parties to a contract, as expressed in the writing signed by them, must govern in determining their rights as derived therefrom.

3. CONTRACTS ⊚�613155—CONSTRUCTION—CONSTRUING IN FAVOR OF PROMISEE.
The language of a contract must be interpreted in the sense in which the promisor knew, or had reason to know, that the promisee understood it.

4. CONTRACTS ⊚�613148—CONSTRUCTION—PRIOR NEGOTIATIONS.
In case of doubt, all the negotiations between the parties may be considered in arriving at the true intent of the parties.

5. EVIDENCE ⊚�613450(5)—PAROL EVIDENCE—AMBIGUITY.
A memorandum of an agreement between complainant and defendant that, if any order for shrapnel fuses was received by or through either of them "from Colonel M.," the profits should be divided as therein stated, was not so clear as to its meaning as to make it improper to admit evidence as to the circumstances out of which it arose.

6. BROKERS ⊚�61349(1)—CONSTRUCTION OF CONTRACT.
Defendant solicited complainant's aid in financing an Ohio corporation, of which he was president, and complainant suggested the possibility of procuring contracts for war munitions. M. had a contract with the Russian government for 2,000,000 shrapnel shells, and had offered the contract to a Canadian corporation. One of the difficulties in the way of its acceptance was to find some one who could supply the necessary time

fuses, and M. promised the Canadian corporation's president to aid in finding contractors to furnish the necessary parts. In a search for a manufacturer he was introduced to complainant, who told him that he had a party who could furnish the fuses, and later brought him and defendant together. Subsequently defendant's Ohio corporation contracted with the Canadian corporation for the manufacture of the fuses. Pending the negotiations, complainant and defendant executed a memorandum of their agreement, providing for a division of profits on any order "received from Colonel M. by or through either of us." *Held* that, in the light of the circumstances, the language "from Colonel M." did not mean that the contract must be one with M., but one obtained through his instrumentality, while the words "by or through either of us" did not mean that the contract must be one under which defendant individually should agree to manufacture the fuses.

7. APPEAL AND ERROR ☞1011(1)—REVIEW—QUESTIONS OF FACT.
 The finding of the District Court, on conflicting evidence warranting such finding, that the contract which defendant obtained for his company was obtained through M., within the meaning of his contract with complainant, would not be disturbed, when not clearly erroneous.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Thomas J. Ryan against Will I. Ohmer. From a decree for complainant, defendant appeals. Affirmed.

See, also, 233 Fed. 165.

The complainant is a citizen of the state of New York, residing in the Southern district in said state. The defendant is a citizen of the state of Ohio. The original complaint also made a party defendant the Recording & Computing Machines Company, a corporation organized under the laws of Ohio, afterwards referred to herein as the Ohio Company, and also the Canadian Car & Foundry Company, Limited, a corporation organized under the laws of the Dominion of Canada, afterwards referred to herein as the Canadian Company. The defendant is the president and a stockholder in the Ohio Company, which was engaged at the time of the negotiations between the parties in a business which had no relation to the manufacture of munitions of war or any parts thereof. Afterwards an amended complaint was filed against the defendant Ohmer alone.

The suit is brought for an accounting under a written agreement, signed by the parties and dated New York, February 20, 1915, which reads as follows: "This is a memorandum of an agreement or understanding that, if any order is received from Col. Mackie by or through either of us for shrapnel fuses within the next sixty (60) days, the personal or individual profits from the order or orders shall be divided as follows: Sixty per cent. to W. I. Ohmer. Forty per cent. to Thos. J. Ryan." The bill of complaint sets forth that in January, 1915, complainant and the defendant entered into a contract or arrangement by which they became joint adventurers in the manufacture of munitions of war or parts thereof, directly or indirectly, for governments at war in Europe; that the complainant's part in this business was to bring the defendant into touch with persons having contracts for such commodities to let, and defendant's part was to perform any contracts so obtained through the Ohio Company, or other instrumentality. It is alleged that pursuant to this arrangement complainant found a contract for time fuses for Russian shrapnel shells, and through his instrumentality the defendant was brought into touch with the persons having this contract to place, with the result that a contract for the manufacture of 2,000,000 shrapnel fuses was given to the Ohio Company by the Canadian Company. This contract, with certain modifications and supplements thereto, is now being performed by the Ohio Company, and the profits thereunder are accruing. When the negotiations between the Canadian Company and the Ohio Company were approaching consumma-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion. the complainant suggested to the defendant that some scheme or arrangement should be entered into for the ascertainment of the profits arising to defendant therefrom, and that some method be fixed for the distribution and division thereof between complainant and defendant in pursuance of their agreement of February 20th. Defendant denied the existence of any such arrangment.

Thereupon this suit was commenced, having for its objects (1) to establish the complainant's rights to a share of the profits arising from said contract: (2) to procure from defendant an accounting of the profits arising from said contract and the payment of complainant's 40 per cent. thereof to him; and (3) in aid of complainant's rights, such injunctive relief as might be necessary to make effective the affirmative relief sought. The District Court entered a decree adjudging that the allegations of the amended bill of complaint had been sustained by the proofs. The decree requires the defendant to account forthwith to complainant for all profits derived by him from the contract made between the Ohio and Canadian Companies, dated March 1, 1915, and any modifications thereof or additions thereto, whether the said profits were in the form of dividends upon the stock of the Ohio Company or increase in the value of his shares, and to account and pay over to complainant 40 per cent. of the profits derived by the defendant, in whatsoever form the same may be. It directs that said accounting shall proceed from time to time, as the profits may accrue, until the contract has been fully performed. It requires the defendant to use his control over his company for the purpose of having the profits ascertained as speedily as is practicable and upon such ascertainment paid and declared as dividends to stockholders of the company. It provides that, pending the completion of the contract of March 1, 1915, and the modifications and additions thereto, and a full and final accounting, the defendant is restrained and enjoined from causing or permitting the Ohio Company to divert or utilize any of the funds derived by that company by reason of the contract which may or should be declared as dividends; and the defendant is further enjoined from selling, transferring, or in any manner alienating or incumbering any of the shares of stock owned by him or for his benefit, or from alienating, transferring, or disposing of any part of the profits derived from the contract, unless and until the rights of the complainant in the profits have been ascertained and fully satisfied; and a special master is appointed, before whom the defendant is directed to make the accounting. From this decree the defendant has appealed.

Walter C. Noyes, of New York City (H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, of counsel), for appellant.

William A. Barber, of New York City, Peter S. Grosscup, of Chicago, Ill., and Joseph Diehl Fackenthal, of New York City, for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This suit is brought to obtain from the defendant the complainant's proportion of the profits realized from an order, alleged to have been obtained through Col. Mackie, for shrapnel fuses. The claim arises under the written memorandum signed on February 20, 1916, and which is hereinbefore set forth. The parties who signed the writing do not agree as to what it means. The defendant insists that the District Court has misinterpreted, misconstrued, and misapplied it; and we are now asked to review the whole of the interlocutory decree, not merely the part granting the injunction, and, if such review warrant, to direct that the bill be dismissed.

[1-4] The written memorandum the parties signed was the culmination of a series of negotiations and activities on their part. It will be admitted at the outset, for the law is well settled to that effect, that the

244 F.—3

execution of a contract in writing supersedes and merges all oral nego-
tiations or stipulations concerning its terms.   It will also be admitted
that the intent of the parties, as expressed in the writing they have
signed, must govern the court in determining the rights of the parties
as derived therefrom.   Indeed, the rule is that greater regard is to be
had to the clear intent of the parties than to any particular words they
may have used in the expression of their intent.   Canal Co. v. Hill, 15
Wall. 94, 21 L. Ed. 64 (1872); Hoffman v. Ætna Fire Ins. Co., 32 N.
Y. 405, 88 Am. Dec. 337.   The language used must be interpreted in
the sense in which the promisor knew, or had reason to know, that the
promisee understood it.   Tallcott v. Arnold, 61 N. Y. 616; Jordon v.
Dyer, 34 Vt. 104, 80 Am. Dec. 668; Evans v. McConnell, 99 Iowa, 326,
63 N. W. 570, 68 N. W. 790.   And the rule is clearly established that
in case of doubt all the negotiations between the parties may be con-
sidered in arriving at the true intent of the parties.   Jennings v. White-
head, etc., Mach. Co., 138 Mass. 594; Kennedy v. Porter, 109 N. Y.
526, 17 N. E. 426; Freeman v. Bartlett, 47 N. J. Law, 33.

To understand this contract, it is necessary to consider the negotia-
tions which led up to it.   In January, 1915, the defendant solicited the
aid of complainant in financing his Ohio Company.   At that time the
complainant suggested to defendant the possibility of procuring for
that company contracts or orders for the manufacture of munitions of
war, or parts thereof, directly or indirectly for the governments at
war in Europe, and the complainant agreed to bring the defendant into
touch with parties having such contracts to let.   The written memo-
randum was drawn, which provides that, "if any order is received from
Col. Mackie," the profits shall be divided in the manner specified.   Col.
Mackie is a reserve officer of the Canadian Army.   He was in Russia
in October, 1914, where he met the artillery board, and after weeks of
negotiations he and three other officers associated with him obtained a
contract with that board to supply it with 2,000,000 shrapnel shells
complete, with a right in the board to increase the number of shells to
5,000,000.   Mackie then returned to England in January, 1915, where
he met Senator Curry, the president of the Canadian Car & Foundry
Company, and offered him the contract.   The latter was not certain
whether he could meet the Russian requirements, and the matter was
left open to be decided after Curry's return to Canada.

One of the difficulties in the way of the acceptance of the contract by
the Canadian Company was to find some one who could supply the
necessary time fuses.   Mackie promised Curry to aid him in bringing
in real contractors who could furnish the component parts needed by
the Canadian Company to fill the contract, and Curry asked Mackie to
join his organization, which the latter did, taking a seat in his office.
Mackie, in his search for a proper party to manufacture the time fuses,
came to New York and was introduced to the complainant, Ryan, who
told him that he had a party who could furnish the fuses.   Later
Mackie introduced Ryan to Curry.   Then, Mackie testifies, "some days
after, Mr. Ryan and I met again, and I asked him to produce his man;
if he was not an actual manufacturer, not to bring him."   The result
was that complainant caused defendant and Mackie to meet.   "Mr.
Ohmer," Mackie testifies, "came to my room and presented one or two

American-made Russian time fuses. I had with me, in my possession,· the time fuses as given to me by the Russian military authorities. I compared Mr. Ohmer's time fuses and those, and after a conference of probably two hours I decided that Mr. Ohmer was not of the floating characters that we were meeting so frequently, but that he was really a man who could make time fuses, and I told him I would bring him to Senator Curry, and he would have to negotiate the contract with Senator Curry or with the Canadian Car, who had decided to take it over, or had taken it over, at that time." This Mackie did, with the result that on March 22, 1915, defendant obtained for his Ohio Company the contract from the Canadian Car & Foundry Company for the manufacture of shrapnel fuses; and Mackie testified that complainant brought the defendant to him pursuant to his request. While Mackie was under cross-examination, counsel said:

"What we want to know is whether you were representing the Canadian Car & Foundry Company at the time of your conversation with Mr. Ohmer?"

To which the witness replied:

"All of the time in America, excepting a pause of about two days, when it looked as if Senator Curry could not arrange finances, each and every person whom I approached or who approached me on boxes, shells, powder, etc., each and every man knew and was given to understand that I was for the Canadian Car; that I was not tooting any horn."

He was then asked:

"What were your duties with the Canadian Car & Foundry Company at that time? What was the nature of the services that you were rendering?"

This was answered as follows:

"Weeding out the chaff from the thousands of men who were calling at the hotel and at the offices or elsewhere, making the selection of Mr. Ohmer in preference to ten other men who said they could make time fuses."

Then followed questions and answers which are reproduced in order:

"You were making the selection of Mr. Ohmer for the Canadian Car & Foundry Company?"
"Yes."
"In making this selection, as you stated, you had no power to make a contract with Mr. Ohmer?"
"None whatever. I should say I was to make the selection of the good from the bad to present to Senator Curry."
"When you interviewed Mr. Ohmer, pursuant to the introduction of Mr. Ryan, you did so in the interest of the Canadian Car & Foundry Company, for them, and not for yourself?"
"For them."
"Not for yourself?"
"No, sir; not whatsoever."
"At the time you could not have executed a contract with Mr. Ohmer for the manufacture of fuses, could you?"
"No."

In the same connection the testimony of the counsel of the Canadian Company, who was also chairman of the executive committee of that company, Mr. Cahan, throws light on the matter under consideration. The witness details a conversation which occurred between himself, Senator Curry, and Col. Mackie, in which the importance of finding a

factory available for the manufacture of time fuses was discussed. He testified that:

"Col. Mackie spoke up and reviewed the conversation he had had with a man named Thomas Ryan. He reported to Senator Curry and to me the purport of a conversation that had been dribbling down for two or three days that Ryan said he had a factory available, and a man available, who could make time fuses. Up to that time I had never heard of Will I. Ohmer. Senator Curry was hurrying away, and I went to my room and drew up a letter to Flint, which meant the exclusion of Flint and the prospective keeping in of Kirby and Bird, and he then turned to Mackie and me, and he said, 'Mackie, this time fuse situation is very difficult and delicate, and I want you to get after Ryan and find out who it is that can manufacture time fuses,' and he turned to me and he said, 'I want to see that everything possible is done to find out about these time fuses, to find out from Bird what Yale and Towne can do, and find out whether Flint controls them;' and as a result of it he left. Mackie came to my room, and I impressed upon him the necessity, and stated how important it was that he should get after this man Ryan and get after him immediately. I told him that I was convinced that, if we turned Flint out, Flint would close up this Yale & Towne opening which had been discussed so much. The next morning I delivered the letter to Bird, and had a row with Flint, and informed Mackie, I think by telephone, that Flint was out, and how was he getting on in finding out about these time fuses. My memory is that I came back to the Hotel Manhattan, being rather anxious about it, and Mackie said, 'I have found out from Ryan that the man who was available was Ohmer.' "

The defendant admits that complainant introduced him to Mackie, and that at that time he had no contract with the Canadian Company. Mackie testifies that he told the defendant that Curry, the president of the Canadian Company, had close relations with one Kirby of Dayton, Ohio, and that he suggested to defendant that he have Kirby substantiate any statements the defendant made about his ability to manufacture time fuses, and that on that day the defendant wired Kirby, who came on to New York, Curry being in New York. The defendant admits that on the day he talked with Mackie he wired for Kirby to come to New York; but he denies that Mackie advised him to wire Kirby, or that he advised him to have Kirby substantiate his statements. We can see no reason why Mackie should have testified falsely, or what interest he could possibly have had to misrepresent what occurred. Mackie is not in any way identified with Ryan, and testified at the trial that he had not seen Ryan since the negotiations, but that he thought he would know him if he met him. "That is my total connection with him." It is very evident from testimony that Senator Curry reposed confidence in Kirby, who had been president of the National Association of Manufacturers and was well qualified to give him information, especially as respects the defendant and his plant, and that Kirby recommended the Ohio corporation and advised Curry to enter into negotiations with defendant.

The complainant testified concerning a conversation with the defendant at the time the memorandum of February 20, 1915, was drawn as follows:

"I said to Mr. Ohmer that this is the first contract that we have, and I am going to be liberal with you. I am going to make a suggestion that you have 60 per cent. and I should have 40 per cent. The percentage was not put in the original memorandum, and I think Mr. Ohmer said, 'I do not own all

the stock of the Recording & Computing Machines Company, and if you should have 40 per cent. of this contract you would have more really than I would,' so he asked me to specify that as to his personal relation as to the stock."

When the defendant was on the stand, he was asked by the court as to the words "from Col. Mackie," inserted in the written memorandum of February 20, 1915.

"Do I understand by that interlineation that you accepted anything that came through Col. Mackie?"

And he replied:

"If it came from Col. Mackie."

Then followed:

"That contract was to be accepted from your dealings with Mr. Ryan?"
"If anything came from Col. Mackie."
"What?"
"In the way of orders."
"As I understand you—I did not catch the other day the full significance of those interlineations—after it was written out you then insisted upon that insertion, the interlineation there, and the purpose of that insertion was that for all orders that had come through Mackie the profits were not to be divided with Ryan?"
"No; any order that Mackie could place the profits arising, any commissions from that order, would be divided. At that time, you see, I had a number of people like Canadian Car & Foundry Company and the Westinghouse and the National City Bank and the New York Air Brake Company all working on the same Russian order. Now here comes another. Mr. Ryan said Col. Mackie was the man who could give a real contract, and I made him state in there that it was to be Col. Mackie and no one else, because some one else might have come in here and been some of the same people I was figuring with —from Col. Mackie and no other."

Senator Curry testified that he thought Kirby introduced Ohmer to him. In this respect his testimony did not agree with that given by Col. Mackie to which reference has already been made.

[5, 6] The written memorandum which is the basis of this suit was hastily written out by the complainant, who is a layman, at the hotel in which he and the defendant were conferring. Upon the suggestion of the defendant, who is also a layman, the words "from Col. Mackie" were inserted. The meaning of the words interpolated is not so clear as to make it improper to admit evidence as to the circumstances out of which the memorandum arose. The rule applicable to such a situation and the authorities supporting it have been stated in an earlier part of this opinion. In the light which the circumstances afford it is evident to us that the language "from Col. Mackie" did not mean that the contract would have to be a contract with Col. Mackie, but one obtained through the instrumentality of Mackie. Neither did the words "by or through either of us" mean that the contract would have to be one in which the defendant individually should agree to manufacture the fuses. The defendant's own testimony makes it entirely clear that it was understood that, if the contract was obtained by his company, the condition of the written memorandum would be fulfilled, provided it came from Mackie. That testimony also makes it clear that the profits to be divided were not the profits made by defendant's

company but that portion of those profits realized by the defendant as a stockholder in the company. So far we have no difficulty.

[7] The question of real difficulty is to determine whether the contract which the defendant obtained for his company was obtained through Mackie. That is a question of fact which is not free from difficulty. And it is made difficult by conflicting testimony. If Ryan, Mackie, and Cahan tell the truth there is no difficulty in reaching the conclusion that the contract came through Mackie's suggestions, notwithstanding the fact that those suggestions might never have come to fruition, had it not been for Kirby's indorsement. But Mackie directed defendant's attention to the relations between Kirby and Curry, and, if his story is true, to the importance of bringing Kirby on from Ohio to assure Curry that defendant's company was equal to the undertaking. So far as the record discloses, Mackie and Cahan have no financial or other interest in the outcome of this litigation. The District Judge, who saw and heard the witnesses, has held that upon the evidence the contract came through Col. Mackie, and this court would not be justified in substituting its judgment for his, unless clearly convinced that his conclusion was erroneous, and we have no such clear conviction.

The court does not in this opinion pass upon any of the questions raised by the defendant as to the scope and form of the interlocutory decree, and this opinion is without prejudice to the right of the defendant to raise all such questions as he may be advised upon appeal from the final decree.

Decree affirmed.