**GATES et al. (SPRATLEN et al., Interveners) v. MEGARGEL et al.**[*]

(Circuit Court of Appeals, Second Circuit. June 2, 1920.)

No. 225.

1. **Joint adventures ⊕⇒5(1)—Action for accounting of secret profits not based on fraud.**

An action by the subscribers to a syndicate against the syndicate managers to compel the latter to account for a secret profit made in the sale of their stock in the syndicate is based on breach of duty by the managers, not on fraud.

2. **Joint adventures ⊕⇒4(1)—Syndicate "promoters" have fiduciary duties.**

The promoter of a syndicate, which is an organization formed for some temporary purpose, has duties of a fiduciary, agent, or trustee to the subscribers of the syndicate.

3. **Joint adventures ⊕⇒4(1)—Syndicate promoter's fiduciary duties attach when he invites subscriptions.**

The fiduciary duties of the promoter of a syndicate attach when he first invites subscriptions to the syndicate, though at that time there are technically no cestuis que trustent.

4. **Joint adventures ⊕⇒4(1)—Syndicate promoter accountable for secret profits, regardless of representations.**

In a suit to compel an accounting by a promoter of a syndicate of secret profits from transactions for the syndicate, which he was not entitled to make, it was immaterial whether the promoter represented to the subscribers of the syndicate that he was making no profit or not.

5. **Joint adventures ⊕⇒4(1)—Subscribers to syndicate agreement bound by terms.**

A subscriber to a syndicate agreement, who signed it, is bound by its terms, whether he carefully examined it, and drew inferences from it, or not.

---

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 254 U. S. —, 41 Sup. Ct. 13, 65 L. Ed. —.

**6. Contracts ⊗═170(1)—Agreement to be interpreted as makers knew it would be by those to whom it was sent.**

A syndicate subscription agreement, prepared and sent out by the managers of the proposed syndicate, is to be interpreted in the sense in which the makers knew it would be understood by the parties to whom sent, especially when it contained statements diverting attention from the thought of the managers' profit.

**7. Joint adventures ⊗═4(1)—Syndicate promoter accountable for profit on stock sales in breach of good faith.**

Whether, under the circumstances, the promoters of a syndicate are entitled to profit by the sale of their corporate stock to the syndicate, depends on whether such sale would be a breach of good faith; the law having established no definite list of things the promoter can do and cannot do.

**8. Joint adventures ⊗═4(1)—Syndicate promoter may sell his stock to syndicate at profit.**

Where the syndicate's subscription agreement disclosed the fact that the managers of the syndicate intended to sell to it their own stock, it was not a breach of good faith for them to sell stock already owned by them at whatever price they could obtain, though they received a profit from such sale.

**9. Joint adventures ⊗═4(1)—Promoter cannot sell to syndicate at profit stock acquired as part of same scheme.**

Where the formation of a corporation and of a syndicate to handle its stock were parts of the same scheme, and the stock was acquired by the syndicate managers for the purpose of delivering it to the syndicate when formed, it was a breach of good faith for the syndicate managers to sell the stock to the syndicate at a profit, without disclosing their profit to the subscribers of the syndicate, though they did disclose the fact that they sold their own stock to the syndicate.

**10. Joint adventures ⊗═4(1)—Subsequent agreement held not ratification of breach of faith.**

A subsequent agreement between the subscribers and managers of a syndicate for the sale of stock discloses no intent by the subscribers to ratify the manager's breach of faith in selling their stock at a profit to the syndicate.

**11. Estoppel ⊗═53—Intent controls.**

Estoppel is mostly a question of intent.

**12. Trusts ⊗═237—Ratification of wrongful acts must be on knowledge of facts and law.**

The beneficiary, who has been wronged by his trustee's breach of faith, can only be held to have ratified his trustee's acts when he not only knows the facts, but is informed of his rights under the law.

**13. Joint adventures ⊗═4(4)—Syndicate members withdrawing cannot recover contribution to expenses from unfaithful managers.**

Members of a syndicate, who withdrew their stock therefrom in accordance with the terms of their agreement, after contributing a stated sum toward the expenses of the syndicate, cannot recover the sum so contributed from the managers because of their breach of trust in selling to the syndicate their own stock at a profit.

Cross-Appeals from the District Court of the United States for the Southern District of New York.

Suit by Herman B. Gates and others against Roy C. Megargel and another, copartners doing business under the firm name of R. C. Megargel & Co. From a decree granting relief to certain plaintiffs and interveners, but denying it to the named plaintiffs and interveners,

the latter appeal, and the defendants also appeal. Reversed, with directions to grant relief to the appealing plaintiffs and interveners.

The parties complainant before this court are but a portion of those who began the suit, many of the original plaintiffs and interveners not having appealed, or having abandoned their appeals after settlement out of court. Hence the case below is reported as Gregg v. Megargel, 254 Fed. 724.

Action arose out of what is called throughout the record a "syndicate agreement," contained in a letter or circular issued by defendants and distributed, not broadcast, but sent to persons who would probably be interested in the stock of a corporation producing petroleum in the state of Wyoming. The printed letter was as follows:

"Private and Confidential.

"R. C. Megargel & Co., 27 Pine Street, New York City.

"August 17, 1917.

"The Glenrock Oil Company

" (Incorporated).

"Capital Stock Syndicate.

"To . . . . . . . . . .

. . . . . . . . . .

"Dear Sirs: The Glenrock Oil Company (Incorporated) has been recently incorporated under the laws of the state of Virginia, with a total authorized capital stock of $10,000,000, divided into 1,000,000 shares, of the par value of $10 each. The corporation was organized for the purpose of acquiring by direct purchase, or through controlling interests in other corporations, producing and prospective oil properties located in the state of Wyoming and elsewhere.

"*We are negotiating for the purchase* of certain shares of the capital stock of this corporation, and are forming a syndicate *to acquire from us a portion of said stock* to the extent of not exceeding 100,000 shares, when, as and if acquired by us, at a price of $7.00 per share.

"The syndicate will terminate on October 15, 1917, subject to our right to dissolve it at an earlier date and to our right to extend it from time to time beyond said date for an aggregate period not to exceed sixty days.

"*We are to be managers* of the syndicate and may be members thereof, notwithstanding our relations as vendors thereto and managers thereof, and as such managers we *shall have full power to determine,* within the limit above stated, *the amount of stock to be purchased from us* by the syndicate, and with full power to sell, purchase, resell and repurchase for account of the syndicate, at public or private sale, any shares of stock at such prices and on such terms as we may deem fit; to pay the usual brokerages, as well as such commissions for effecting sales or purchases for account of the syndicate as we may deem proper; to charge the syndicate reasonable commissions and the usual brokerages for sales or purchases effected by us; to make advances to the syndicate, charging interest thereon; to make or procure loans and secure the same by pledge of syndicate stock or otherwise, to such amounts and in such manner as from time to time we may deem expedient; and generally to act in all respects as in our opinion may be to the interest of the syndicate. *We shall not be liable under any of the provisions of this letter or for any matter connected therewith, except for want of good faith,* and no obligation not herein expressly assumed by us shall be deemed to be implied.

"The syndicate managers may purchase, sell or otherwise dispose of, or be interested in the purchase, sale or other disposition of, any stock or other securities of said corporation or its subsidiary companies, or contract in any respect with it or them, without restriction and without responsibility therefor to the syndicate.

"All expenses incurred in the acquisition of such stock for the syndicate, in the marketing of the same, and all other expenses incurred by us as syndicate managers shall be charged against the syndicate. *We shall make no charge to the syndicate* for acting as syndicate managers, other than reasonable com-

missions and the usual brokerages for sales or purchases affected by us *being otherwise compensated in our purchases of said stock.*

"Your total obligation shall not in any event exceed the amount of your participation as herein stated, but the failure of any participant to perform any part of his obligation hereunder shall not release any other participant. Nothing herein contained shall constitute the participants partners with the syndicate managers or with one another. Syndicate participations are not transferable except with the written consent of the syndicate managers. The syndicate managers reserve the right to cancel the participation of any member violating the syndicate provisions, and to hold him liable for any losses sustained by such violation. The firm constituting the syndicate managers acts as a copartnership and all rights and powers hereunder of said firm shall vest in any copartnership which shall be the sole successor of said firm without further act or assignment.

"We, as syndicate managers, may grant to, or withhold from, any syndicate participants the privilege of withdrawing their respective allotments of stock, or any part thereof, for investment. No participant withdrawing stock shall be entitled in respect thereof to share in any profits of the syndicate. Applications to make such withdrawals, in whole or in part, must be made to us upon written acceptances of participation within the period below provided, and any such application may be refused or granted by us in such cases and to such extent as we may, in our discretion determine. In respect of your participation, or any part thereof, so withdrawn, you will be required to pay at the time and in the manner hereinafter provided an additional sum of one dollar per share on the number of shares so withdrawn to cover the proportion of the syndicate expenses attributable to such withdrawn participation. Upon the completion of all payments in respect of such withdrawn stock, you will be entitled to receive an appropriate certificate, issued by or on behalf of the syndicate managers, reciting that you are the owner of the number of shares specified therein and will be entitled to receive the same upon the termination of the syndicate. No stock so withdrawn from sale by any participant shall be delivered to him until the termination of the syndicate.

*"We have reserved for you, subject to the acquisition by us of such stock* and to the reduction of such participation in case of over-subscription as hereinafter provided, a participation in the syndicate of            shares of such stock, which, at the syndicate price of $7.00 amounts to $

"Should you desire to accept such participation please confirm your assent to the conditions as herein stated by signing the enclosed acceptance and return the same to us at No. 27 Pine street, New York City, on or before August 23, 1917, after which time all offers of participation not so accepted will be deemed refused and cancelled. This letter and your acceptance will thereupon constitute the contract between us.

"All acceptances, in whole or in part, are subject to our approval, and in case of an oversubscription the syndicate managers shall have the right to allot to you such less amount of participation in the syndicate than the amount reserved as above stated, as they in their uncontrolled discretion may determine.

"You will be required to make payment in New York funds in respect of your obligation hereunder to the syndicate managers at their office, No. 27 Pine street, New York City, on three days previous notice stating the amount of participation in the syndicate allotted to you by the syndicate managers as above stated, mailed or telegraphed to you by us, against delivery to you at said office of subscription receipts representing your payment. Such call may, in our discretion, be for full payment or for payment in installments.

"Yours truly            ............, Syndicate Managers."

The foregoing letter, with signature and address written in as required, came to every party complainant here or below, or to some duly authorized agent of each complainant, and each of them signed personally or by an admitted agent the form of acceptance referred to in the letter. Such acceptance merely acknowledged receipt of "your letter dated August 17, 1917, * * * offering us a participation" in the stock syndicate aforesaid, "which *we hereby accept upon the terms therein stated."* The italicized portions of the

foregoing documents were not so printed in the original; the italics but serve to emphasize words and phrases deemed by us especially important.

The Glenrock Oil Company was "organized on the morning of the 17th of August," 1917. On its organization there was "a complete dummy board of directors, who did nothing except the formal matters of adopting the seal and by-laws and things of that kind." Subsequently they resigned, and then the "real board of directors" was chosen, which contained one Collins, from whom were in a sense derived the 100,000 shares of stock mentioned in the syndicate agreement. On August 10, 1917, Collins, as the representative of sundry existing oil companies located or operating in the state of Wyoming, agreed with Megargel that the Glenrock Oil Company should be organized, with a capital stock of $10,000,000, eight-tenths of which should be "issued or reserved for issue to acquire if possible a controlling interest in" (inter alia) the existing corporations represented by Collins.

Thus Collins would, in exchange for the shares of the existing company, acquire many shares of the Glenrock Oil Company when formed, and on August 10, 1917, he agreed in writing with the defendants that, if he should so acquire 242,500 shares, he would sell and Megargel would buy "100,000 shares thereof at the price of $3.50 per share," but Megargel should have five months from the date of the newly formed company's acceptance of the controlling interest held by Collins as aforesaid within which "to draw down stock under their purchase," provided that such stock should be deliverable to Megargel only "in lots of 1,000 shares or multiples of 1,000 shares at any one time," and that at least 20,000 shares should be "drawn down" each month. Payment at the contract rate was to be made by Megargel when and as he "drew down" each block or lot.

Contemporaneously with the execution of the Collins-Megargel agreement, defendants made a written contract with one Taylor (who likewise subsequently became a director of the Glenrock Oil Company) to purchase on a six months option 44,000 shares of Glenrock at the same price of $3.50 per share.

The Taylor-Megargel contract contained the following stipulation: "The parties of the second part [Megargel] agree to use their best efforts to form a syndicate to purchase from them not exceeding 100,000 shares of the capital stock of the company [Glenrock Company] when as and if acquired by the parties of the second part [Megargel] and to use their best efforts by means of said syndicate and otherwise to create and establish a market for shares of the capital stock of the [Glenrock] Company."

The Collins-Megargel agreement contains the following stipulation: "The parties of the second part [Megargel] agree to use their best efforts to form the syndicate above mentioned, and by means of said syndicate and otherwise to create a market for the shares of the company."

In this last-named contract there is no previous reference to the syndicate, but it is established by the testimony that Collins, Taylor, and one Pelton were, in dealing with Megargel, "really acting for the new company"—i. e., Glenrock Oil Company—when formed, and we have no doubt that the syndicate seven days later launched by the defendants was a part and parcel of the scheme of creation of the Glenrock Oil Company.

Defendants ultimately took and paid for the 100,000 shares of Glenrock, and made such payments after they had collected from the syndicate subscribers, and practically with the money furnished by said subscribers. Having as individuals obtained said 100,000 shares of stock, defendants transferred the same to the syndicate, or to themselves as syndicate managers, on their own books. No other transfer took place, nor were any taxes paid as upon a transfer from vendor to vendee. Defendants then attempted to market the syndicate stock on the "New York curb"; they bought as well as sold, "supporting" prices by such purchases. Their efforts were not wholly successful, although the quoted price was maintained above the syndicate price until December 10, 1917; thereafter it fell almost continuously, until on the 20th of December it reached less than $5 per share, and on that day the subpoena in this cause issued.

The reason for suit was the discovery by the original plaintiffs, or some of them, that defendants had paid but $3.50 a share for the stock put into the syndicate at $7. On this point the principal defendant testified: "I never told anybody what I was paying for the stock; I never told anybody who subscribed to the syndicate until long after the syndicate was formed."

The bill of complaint herein is sufficiently analyzed in the reported opinion below. The syndicate subscribers, who came in as interveners, did not so vary the history of the transaction as to require separate consideration. The voluminous record is for the most part devoted to explaining how and with what knowledge or notice, or means of acquiring knowledge, the various parties complainant joined the syndicate. To those who proved to the satisfaction of the court that they had been actually deceived, either by the language of the syndicate letter or dehors that letter by defendants' words, the court awarded decrees, excepting only to those who, with knowledge of the price paid by Megargel, agreed to enter a second syndicate, which on or about November 1, 1917, defendants sought to form to carry forward the affairs of the first syndicate, which by that time promised to fail. Nothing ever came of this second effort at syndication.

The complainant appellants in this cause represent those who did not show any deception personally wrought on them by defendants, or who were debarred from the fruits of such deception by their transactions in respect of the attempted second syndicate. Defendants' appeal (after settlements made) refers to matters of detail not requiring special statement. But one of defendants took any part in this firm transaction; hence they are spoken of usually in the singular number.

George L. Ingraham, of New York City, for appellants Gates and Eccles.

Henry Wollman, of New York City, and Clarence Alexander, of Yonkers, N. Y., for remaining complainant appellants.

Powell, Wynne, Lowrie & Ruch, of New York City (Marvin W. Wynne, of New York City, of counsel), for defendants.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The task presented by this appeal is to ascertain the relation of the parties to each other, and when the same was assumed; the law applicable to any relation compatible with the evidence is not doubtful. One kind of relation is fixed by the pleadings; and we agree with the trial court that plaintiffs, whether original or intervening, have not sued for damages caused by fraudulent representations, nor sought to rescind a contract. The "Syndicate agreement" is assumed or asserted to be valid; plaintiffs intend to keep what they got under it, but that document made Megargel their trustee, who has, however, while otherwise executing his fiduciary duties, (1) deceived them in respect of the price to him of the syndicate stock, and (2) made a secret profit out of such deception. Therefore the bill calls him to account for his stewardship.

[1] The action is not based on fraud, but on breach of duty; it is not described in the list of remedies given in Heckscher v. Edenborn, 203 N. Y. at page 220, 96 N. E. 441, and is like Yale Gas, etc., Co. v. Wilcox, 64 Conn. 101, 29 Atl. 303, 25 L. R. A. 90, 42 Am. St. Rep. 159. (For a similar, but statutory, proceeding, see Omnium, etc., Ltd., v. Baines, [1914] 1 Ch. 332.) That breach of fiduciary duty may be and often is fraud is really immaterial in this form of action;

but the form renders it imperative first to establish the fiduciary relation, and impose the duty before a breach can be relied on. Defendant admits that a time came when, as syndicate manager, he was plaintiff's fiduciary; but he dates such assumption of duty only from the day the syndicate was formed, and the business of "creating a market" for Glenrock stock began. What he did, or what happened before that time, is said to be something with which plaintiffs have no concern, nor right of inquiry.

[2] It being plain that in a wide sense this syndicate was an offshoot, if not a part, of the promotion or launching of the Glenrock Company, the accepted meaning or standing of the words "promoter" and "syndicate" may be considered. Lord Justice Bowen more than 40 years ago said that "promoter" was a term, not of law, but of business, usefully summing up a number of operations familiar to the commercial world, generally those by which a corporation is brought into existence. Whaley, etc., Co. v. Green, 5 Q. B. Div. 109. Nor has it since gained any more accurate definition (Yale Gas, etc., Co. v. Wilcox, supra; Bigelow v. Old Dominion, etc., Co., 74 N. J. Eq. at page 501, 71 Atl. 153), and has been applied in the western part of this country to mere speculators in mining claims (Snow v. Nelson [C. C.] 113 Fed. at page 355). Yet, loose as is the title, the duties of a fiduciary, agent, or trustee have been imposed upon its bearer. Dickerman v. Northern, etc., Co., 176 U. S. at page 204, 20 Sup. Ct. 311, 44 L. Ed. 423.

"Syndicate" is also a word of business and not of legal art. It signifies an organization "formed for some temporary purpose" (Palmer, Private Companies and Syndicates), and came into English use contemporaneously with "promoter." Mr. Palmer points out that such unions for speculation were frequently registered under the Companies Act of 1862, without share capital, in order to limit liability. Of the use of the word, and of registration, Erlanger v. New Sombrero, etc., Co., L. R. 3 App. Cas. 1218, is a well-known and rather early instance.

The "temporary purpose" of this syndicate was that common at present and in the United States—to pool securities, under an agreement to take them at a price, if the public could not be persuaded to relieve the joint adventurers by paying a higher price. Between a man who forms or "promotes" such a business venture, and one who gets shareholders for a new corporation by any of the means shown in a long line of reported cases, we perceive no legal difference whatever, and indeed identity of function between a syndicate former and a company promoter has been assumed in the most recent decisions. Heckscher v. Edenborn, supra; Sim v. Edenborn, 242 U. S. 131, 37 Sup. Ct. 36, 61 L. Ed. 199.

[3] Thus the question is reached: Did a fiduciary relation exist between subscriber and syndicate maker, between plaintiffs and Megargel, when (in legal contemplation) the latter on August 17, 1917, invited the former to come into his scheme? We have no doubt such relation arose instanter; of course, in one sense, it could not fully exist until there was a cestui as well as a trustee; but, if one asks another to trust him, he assumes the position of a trustee for many

266 F.—52

purposes by the act of asking. If, therefore, defendant on August 17th assumed a position of trust quoad possible subscribers now represented by these appellants, what was he in duty bound to tell them? Undoubtedly that what his syndicate would buy he himself had for sale, and that was done; we think the wording of the agreement plain on this point.

[4, 5] But was defendant bound to state either what he had agreed to pay for what he wished to sell, or the bald fact that he would profit by the sale? This is the crux of the case, and here we differ with the learned trial court. If it was defendant's duty to disclose, or if he was by law under a disability to take a secret profit, it was immaterial under this bill whether he also represented orally or otherwise that he was putting the stock to the syndicate at what it cost him. It was also immaterial whether a subscriber carefully examined and drew inferences from the syndicate agreement or not; he signed it, and is bound by its terms, and by this action recognizes it as his agreement. What he complains of, and all he complains of, is Megargel's lack of good faith, or breach of duty (in effect the same thing), in carrying out the agreement.

[6] That defendant did not disclose is admitted, but we may go further and hold, without analyzing the agreement phrase by phrase, that the document contains an apparatus of words which diverts attention from the thought of vendor's profit, and creates by suggestion the belief, so far as this particular lot of 100,000 shares is concerned, that defendant was coming into the syndicate on an equality with all others, but hoped to make money by other purchases of stock. Such a document especially invites application of the rule that a writing is to be interpreted in the sense in which the maker knew or had reason to know it would be understood by the party to whom he tendered it. Ryan v. Ohmer, 244 Fed. 34, 156 C. C. A. 459; Moran v. Standard Oil Co., 211 N. Y. 196, 105 N. E. 217. Therefore we hold that defendant ex industria concealed his expected profit at a time—i. e., August 17, 1917—when he asked to be the trustee for every party plaintiff in this action.

[7] Thus defendant's position is seen to be that one who says to his invitees, "I ask you to trust me to buy from myself with your money, and for your ultimate account, but presently for an entity of a syndicate which I shall manage, in the hope of profit for all of us," is under no duty to say more. This is a question of law, yet the law does not offer, and never has made, a list of the things promoters can do and cannot do. Every act complained of is to be tested by asking whether the relations between the promoter, and the birth, formation, and floating of the venture he promotes, are such as to render it contrary to good faith that the promoter should derive a secret profit from the promotion. This is Lord Justice Bowen's formulation of the rule in Whaley, etc., Co. v. Green, supra, and it has not been improved on. It has been often said (e. g., per Pitney, J., then Chancellor, in Bigelow v. Old Dominion, etc., Co., supra, 74 N. J. Eq. at page 502, 71 Atl. 153) that fraud need not be shown "to disentitle the promoter to his secret profit," and the reason for it is that good faith often fails, where fraud is

neither contemplated nor attempted; lack of good faith is often no more than something judicially deemed against public policy.

[8] But defendant, if he had no shares of Glenrock on August 17th, had agreed to take and pay for them; wherefore it is urged that, even, admitting his agency or trusteeship, and a status equivalent to that of a promoter, he still had good right to sell his own property to his syndicate at any price he could get, if the identity of the vendor was stated. The right contended for exists, and, though often stated, never better than by James, L. J., in Gover's Case, L. R. 1 Ch. Div. at page 187, and by Sharswood, J., in Densmore Oil Co. v. Densmore, 64 Pa. 43, who agree that "in point of law" a man may sell his own property to an entity he himself forms, just as he may sell to another the right to become his partner; it being assumed that in the "original purchase there was no confidential relation" affecting the seller with a trust. In such a transaction the parties, it is said, "deal at arm's length," and the vendees "must exercise their own judgment"; in other words, "caveat emptor" applies.

This is all true, not because the thing sold belonged to the promoter, but because such ownership stood the test of good faith. The time of acquisition has been considered; and in Highway, etc., Co. v. Ellis, 7 Ont. L. R. 504 (a case much pressed on us by defendant), the court declined to hold a promoter because it had not been shown that "at or before" the date of purchase the promoter had invited the public to come in.

[9] Whether the inquiry be, were these parties dealing at arm's length? or was there a confidential relation imposed on this defendant at his date of purchase? the answer is unfavorable to defendant. They were certainly not dealing at arm's length, for that phrase implies no lodging of discretion by one party in the other, and here Megargel had absolute discretion whether to buy from himself or not. As for the existence of a confidential relation at the time of purchase, it is to be remembered that the Collins-Megargel contract was made in contemplation of this syndicate, both were parts of the launching of the Glenrock Company, and the creation of the company (and therefore of stock) was simultaneous with the syndicate agreement, whereof one object was to get the money wherewith to pay for the stock.

Time here, merely as time, is not of the essence, and we think it clearly shown that the object of the contract was to give a coating of legality to a preconceived intent (1) immediately to sell to the syndicate at a profit of 100 per cent., and (2) to conceal the profit from the syndicators. The profit plainly depended on successful concealment; the trusteeship was sought to get the profit. Under such facts, the whole transaction must be regarded as unitary, and defendant held as a fiduciary ab initio, because he agreed to take stock only to pass it along to himself as trustee. Since liability grows out of duties equitably imposed by a voluntarily assumed relation, it may be said generally that one who seeks or creates an agency or trusteeship or any fiduciary position, for the purpose and with the intent of secretly profiting therefrom, is not acting in good faith, and from the time he forms the intent occupies such a position "that any profits resulting

from his dealings with" the concern whose agency he seeks must be accounted for. McKay's Case, L. R. 2 Ch. Div. 1; and compare statement of general rule in United States v. Carter, 217 U. S. at page 306 (30 Sup. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594). If defendant's fiduciary position be taken to date from the launching of the syndicate on August 17th, or even from date of subscriptions, we do not overlook the strong arguments for appellants based on the language of the agreement, but have preferred the broader ground above stated.

[10-12] There remains the question of estoppel urged against such of the present appellants as consented to go into the inchoate and futile second syndicate, after learning of defendant's secret profit. Estoppel is mostly a question of intent (Dorrance v. Barber [C. C. A.] 262 Fed. at page 492), and certainly no intent to ratify their trustee's breach has been shown in respect of these appellants. But on the holding now made, that these appellants were cestuis que trustent and were dealing with their trustee, it is plain law that a cestui who has been wronged by his trustee can only be held to have ratified when he not only knows the facts, but is informed of his rights under the law. In re Long Island, etc., Co., 92 App. Div. 1, 87 N. Y. Supp. 65. The present case falls far short of meeting this requirement.

So far as it affects the present appellants, the decree appealed from is reversed, and the cause remanded for further proceedings not inconsistent with this opinion. Appellants are entitled to an accounting, upon which the defendant must be surcharged with $3.50 in respect of each share accounted for.

[13] But, since the contract has not been rescinded, we see no reason why those appellants who withdrew their stock from the syndicate on paying a dollar a share over the syndicate price should not be held to their bargain. They agreed to contribute that dollar to the funds of the joint adventure, it was the price of escaping further loss or foregoing gain, as the case might be, and the sum so paid they cannot complain of. The reasons for granting an accounting in addition to those heretofore indicated are that the general adventure of the syndicate ended by lapse of time and the account proffered by the defendants and in evidence before us is insufficient, even without any reference to the matter of secret profits. Marvin v. Brooks, 94 N. Y. 71.

The appealing plaintiffs and appealing interveners will each recover one bill of costs in this court. No direction is given as to the costs of the District Court.