CITY OF MEMPHIS, TENNESSEE, for and on Behalf of the MEMPHIS LIGHT, GAS & WATER DIVISION, Plaintiff-Appellee,

v.

FORD MOTOR COMPANY, Defendant-Appellant.

No. 14699.

United States Court of Appeals
Sixth Circuit.

June 20, 1962.

Richard I. Fricke, Dearborn, Mich., McDonald, Kuhn, McDonald, Crenshaw & Smith, Memphis, Tenn., on brief; Richard B. Darragh, Dearborn, Mich., of counsel, for defendant-appellant.

Charles C. Crabtree, Memphis, Tenn., Frank B. Gianotti, Jr., Memphis, Tenn., on brief, for plaintiff-appellee.

Before McALLISTER and O'SULLIVAN, Circuit Judges, and STARR, Senior District Judge.

McALLISTER, Circuit Judge.

This is an appeal by Ford Motor Company from a judgment of the district court in favor of appellee, City of Memphis, in the amount of $252,576.78, claimed to have been the amount due, with interest, under a contract between Ford and the City of Memphis.

The background of the case is as follows: Ford maintained an assembly plant in Memphis for more than twenty years until January, 1959, when it sold the property. During the period it owned and operated the plant, Ford purchased all of its requirements for electricity from the Memphis Light, Gas & Water Division, herein called the Division—or the City of Memphis—pursuant to several electric service agreements, the last of which is dated November 19, 1956, and is the contract here in issue. When Ford sold its plant and moved from Memphis, in January, 1959, it paid all of its bills for electricity supplied by the City of Memphis up to that time.

The district court held that after the sale of its plant, Ford was obliged to pay the stipulated minimum bills for the remainder of the five-year period for which it had contracted, which remaining period aggregated 34½ months.

Ford contends that, after it sold its plant, it no longer required electricity at that location; that such electricity was never generated or used thereafter by Ford up to the time of the trial; and that the interpretation of the contract by the district court that Ford was obliged to pay for the electricity that the City of Memphis did not generate and that Ford would not and could not use, was unusual and oppressive in its results, and that such interpretation was erroneous.

The contract, and schedules attached thereto, insofar as here pertinent, provide:

1. "The Division will sell and deliver to the customer and the Customer will purchase from the Division electric energy to be *used* for the operation of plant—at the rate applicable for this class of service, as the same may be lawfully fixed from time to time." (Emphasis supplied.)

2. "The term of this contract shall be five years from date of initial service hereunder."

3. "Electric energy supplied under this schedule is for the exclusive *use* of the customer and shall not be re-sold." (Emphasis supplied.)

4. "The minimum monthly bill for demand and energy for customer's contracting for and having demands greater than 5000 kw shall in no case be less than $1.20 per kilowatt, times the highest demand established during the preceding 12 months or contract demand, whichever is greater."

5. "Electric energy sold under this contract shall be in the form of alternating current at approximately 12000 volts—and shall be metered at approximately 1200 volts."

6. "The maximum 30 minute rate of use (demand) under this contract shall be 5300 kilowatts."

7. "The point of delivery for electric energy sold under this contract shall be at the Division's substation bus, and maintenance by the Division of approximately the above stated voltage and frequency

at the point of delivery *shall constitute delivery of service* for the purpose of this agreement." (Emphasis supplied.)

8. Interruptions of service due to "force (majeure)" were permitted in Paragraphs 12 and 13 of the terms and conditions, but in each of said paragraphs is the language "*provided further nothing contained in this paragraph shall relieve customer from any minimum bill requirements.*"

The crux of the case is whether Ford was obligated under the contract with the City of Memphis, or Division, to pay, during the period of the contract, minimum monthly bills for electricity at the rate specified in the contract, regardless of whether the electricity was used by Ford, or generated or produced by the City of Memphis. The district court held that Ford was so obligated; Ford insists it was not.

■ We are of the view that all of the circumstances of the case, including the fact that the contract specifically provided that it should continue for a term of five years, and that it also provided for payment of minimum monthly bills during that period, sustain the holding of the district court that Ford was liable to the City of Memphis for payment of the minimum monthly bills during that remainder of the five-year period, after which it had sold its plant and discontinued business.

■ It is claimed by appellant Ford that the phrase in the contract stating that the "Division will sell and deliver to the Customer, and the Customer will purchase from the Division, electric energy to be used by the Customer," should have been interpreted by the court to mean that the Division agreed to sell only the amount of energy actually used by Ford; that Ford could cease to use the electric energy at any time; and that it would thereafter be under no obligation to pay anything except for what it had actually used. This contention is ad-

vanced on the theory that the contract was a so-called "requirements contract," in which the City agreed to sell only what Ford required from time to time. Ford, however, explicitly agreed in the contract to pay for more than it might use, from time to time, through the agreement to pay minimum monthly bills.

The district court found, in effect, that the contract was not a "requirements contract" but was a contract for a five-year term, under which Ford was obligated to pay the minimum monthly bills specified in the contract during that period; and we are in accord with this finding.

■ Ford further submits that the contract with the City of Memphis contemplated that the rate schedule included therein was subject to change from time to time, as conditions might change over the five-year period of agreement; and that, according to the agreement, "If quantity or rate of use (demand), or character of use of electric energy by Customer should change to such an extent that Customer does not comply with the availability clause * * *, then the applicable rate schedule shall be changed, effective when Customer brings these facts to the attention of the Division's [City's] Electric Rate Engineer in writing, except when character of load requires a special investment by Division to serve Customer; and Division's Electric Rate Engineer may likewise apply proper rate schedule when facts are brought to his attention justifying same."

The "availability clause," above referred to, states: "This schedule is available for electric service to commercial, industrial, governmental and other customers having demands of 20 kilowatts or greater. * * *" From the foregoing, Ford contends that when it ceased business, its rate of demand fell below 20 kilowatts, since it no longer had any requirements whatever for electricity, and that, therefore, the proper rate schedule was zero, since the rate schedule contained no minimum bill provision.

The interpretation of the contract sought by Ford would result in abrogating the five-year term of the contract and the provision therein for payment of minimum monthly bills whenever Ford decided to purchase no more electric power. The parties are in direct conflict as to the interpretation of the contract and the schedule which is included therein. The five-year term of the contract is plain; and the provision for payment of minimum monthly bills is plain. Taken alone, these clearly sustain the contention of appellee City of Memphis. The provision in the schedule of the contract with regard to "change of rate or use," as above mentioned, would, according to Ford, immediately terminate the five-year period of the contract and end all liability for payment of minimum monthly bills whenever Ford desired, merely by its declining to use any electric power whatever. The "change of rate or use" provision, in our opinion, is not clear. It does not provide explicitly that Ford will be released from all liability for payment of the stipulated minimum monthly bills during its five-year contract if it sells its plant or refuses to use any electricity. The obligation to pay such minimum monthly bills during the five-year period, expressed with such definiteness and certainty in the contract, is incongruous with a provision that is sought to be interpreted as giving Ford a complete release from such contractual liability whenever it desired. While a construction, such as contended for by Ford, can be deduced from the schedule, it seems a rather surprising interpretation from phraseology not clearly expressed, and would result in a contract that is contrary to, and destructive of the other provisions which are clearly expressed. On the whole, the meaning of the contract is not so clear as to make it improper to admit evidence as to the circumstances surrounding its execution. Ryan v. Ohmer, 244 F. 31, 37 (C.C.A.2). In such circumstances, the court is called upon, in construing the agreement, to ascertain the intention of the parties from the circumstances surrounding the execution of the contract. A contract must be construed as a whole and effect given to its every part. Dickinson v. Stokes, 62 F.2d 84 (C.C.A.6). The cardinal rule with respect to construction of contracts is to give effect to the intention of the parties in the light of the surrounding circumstances. Prudential Ins. Co. v. Nelson, 101 F.2d 441 (C.C.A. 6).

In ascertaining the intention of the parties, under these circumstances, the court might well inquire whether Ford would have executed the contract if it had considered and understood that it would be liable during the five-year period for payment of minimum monthly bills, and whether the City of Memphis would have executed the contract if it had considered and understood that Ford would be discharged of all liability for the minimum monthly bills during the five-year period, whenever it wished to cease operations. Moreover, the court might consider whether the evidence indicated that Ford knew or had reason to know the sense in which the City understood the contract. For, if one party to a contract knows the meaning that the other party intended to convey by his words, then the first party is bound by that meaning, and the same is true if the first party had reason to know what the other party intended. Cresswell v. United States, 173 F.Supp. 805 (Ct. of Cl.); Star Chronicle Pub. Co. v. New York Evening Post, 256 F. 435, 441 (C.C.A. 2); Ryan v. Ohmer, 244 F. 31, 34 (C. C.A.2). See Bowers Hydraulic Dredging Co. v. United States, 211 U.S. 176, 188, 29 S.Ct. 77, 53 L.Ed. 136.

As hereafter appears, the trial court sought to ascertain the intention of the parties from the surrounding circumstances; and, among other circumstances, it appeared from the uncontradicted evidence that it was the understanding of the City of Memphis that Ford was bound to pay the minimum monthly bills during the five-year period of the contract, and it further appeared that the City explained to Ford at the

time of the execution of the contract that it would be liable for the payment of minimum monthly bills during the entire period of the contract, regardless of its requirements.

In its findings of fact, the district court set forth the circumstances under which the agreement between Ford and the City of Memphis was entered into. At the time the contract was executed on November 19, 1956, the City of Memphis received its power supply from the Tennessee Valley Authority, an agency of the United States, under a wholesale power contract which expired June 1, 1958. This contract between the Tennessee Valley Authority and the City of Memphis required the Authority's approval of the City's resale power rates and, accordingly, the City was required to secure from all industrial customers, having a load of 5,000 kilowatts or more, contracts to run for a minimum period of five years and to provide for minimum monthly bills as defined in the applicable rate schedule.

Furthermore, the district court found that the custom and practice of electric facilities in the Tennessee Valley area, and throughout the country, is to require large industrial customers, such as Ford, to execute contracts providing for minimum bill requirements, and for terms of five years or more. It appears that for several years prior to June 1, 1958, the expiration date of the wholesale power contract between the City of Memphis and the Tennessee Valley Authority, the City had been engaged in the construction of a steam generating plant, which was the largest construction project in the history of the City of Memphis, requiring the issuance of more than $163,000,000 in bonds. At the time of the negotiation of the contract between the City of Memphis and Ford, the construction of such generating and transmission facilities was under way, and arrangements were being completed for financing the construction. The fixed charges alone on an investment to supply Ford's needs, as set forth in the contract, would be much more than the amount of the minimum bills specified in the contract between the City of Memphis and Ford.

It appears that, in the electric power industry, plans must be made for the determination of power needs from three to five years in advance in order to take care of future loads because of the extended period required for the planning and construction of large generating units, and this extended period is referred to in the industry as "lead time." It is normally impossible to adjust construction programs to take account of the loss of major loads occurring within such lead time; and this is the economic basis for the industry's requirement of contracts for fixed periods with minimum payment obligations during the entire term of the contract.

Ford emphasizes that, prior to the execution of the contract with the City of Memphis on November 19, 1956, the City had made its commitments to construct and equip a new generating plant. However, at that time, prior to the construction and completion of its own plant, the City was purchasing its power supply from the Tennessee Valley Authority, and the fact that the City had made commitments to construct the plant before it had secured the binding contract from Ford agreeing to minimum monthly payments over a five-year period, does not vitiate the contract for lack of consideration or require the conclusion that the City, in completing the plant, did not plan for Ford's future requirements, and did not rely upon Ford's agreement to pay minimum monthly bills for the entire five-year period.

In the instant case, the City of Memphis had idle capacity through the whole period from and after the abandonment of Ford's assembly plant through the date of expiration of the contract; and the effect of the loss of Ford's load has been to increase the amount of idle capacity by the amount of the load which was thus lost. Ford knew, at the time of the execution of the contract, that the City of Memphis was then engaged in the

vast construction program entailing the large bond issue above mentioned, and that the principal purpose of the contract between the City of Memphis and Ford was to provide assurance of the payment of minimum bills throughout the term of the contract regardless of the requirements of Ford. The City of Memphis, at about the same time, entered into similar contracts with all other industrial customers having a contract demand of 5,000 kilowatts or more. Discussions were held with each such customer to explain the reason why a five-year term with a minimum bill payable throughout the whole term, was necessary. Such a discussion was held by representatives of the City with representatives of Ford immediately prior to the execution of the contract of November 19, 1956; and, as has been said, during such discussion, the representatives of the City explained to the representatives of Ford that the minimum bills would be payable throughout the period regardless of Ford's requirements.

In addition to the generating and transmission facilities required for service to enable the City to supply Ford's power requirements, the City installed transmission and distribution equipment on and near Ford's premises, devoted exclusively to Ford's use. After Ford ceased operations, its representative called upon the representative of the City to ascertain if it would be agreeable to have Ford pay the net book value of the equipment that had been installed to serve Ford Motor Company, *in lieu of the minimum bill payments*

Of course, Ford would not be obligated to make the payments claimed by the City because of the fact that the representative of the City had explained that the minimum bills would be payable throughout the period, regardless of Ford's requirements; and Ford would not be liable, merely because its representative asked the City if it would consider having Ford pay the net book value of the equipment that was installed to serve Ford, *in lieu of the minimum bill payments*. But these, together with all of the other circumstances, including the construction of the huge generating plant at the expense of millions of dollars, the conversations carried on with the representatives of Ford, as to why a long-term contract with minimum monthly bills stipulated, was necessary, and the explanation by the representative of the City immediately before the signing of the contract that the minimum bills would be payable throughout the whole term of five years, regardless of the actual requirements of Ford, taken together with the fact that the contract provided explicitly for a term of five years and for payment of minimum monthly bills during that entire period, were matters properly considered by the trial court in ascertaining what the intention of the parties was in executing the contract; and the determination of the district court that the parties thereupon agreed that Ford would be bound to pay minimum monthly bills during the five-year period of the agreement, regardless of its requirements, was sustained by the evidence.

Under the contract, as interpreted by the district court, Ford was indebted to the City in the amount of the minimum monthly bills for the balance of the five-year period, after which Ford had sold its plant and discontinued the use of electric power. There is nothing in the contract to indicate that the parties contemplated that no amount should become due from consumer in the event that the manufacturing establishment ceased to exist; the contract plainly imposed an obligation on the consumer to pay the amounts specified whether or not electrical energy was used.

The accumulation of minimum monthly bills through February, 1961, the date of trial, amounted to $186,750.78. The total of the minimum monthly bills for the balance of the five-year term of the contract after Ford sold its plant, including a period subsequent to the date of trial, amounted to $252,756.78.

"It is no longer open to question in this court that, as a rule, where a party bound by an executory contract repudiates his obligations or disables himself from performing them before the time for performance, the promisee has the option to treat the contract as ended, so far as further performance is concerned, and maintain an action at once for the damages occasioned by such anticipatory breach. * * * There is no doubt that the same rule must be applied where a similar repudiation or disablement occurs during performance." Central Trust Co. of Illinois v. Chicago Auditorium, 240 U.S. 581, 589, 36 S.Ct. 412, 60 L.Ed. 811.

It is contended by appellant that the charges so recovered, in this case, are in the nature of a penalty, rather than liquidated damages. We do not agree. The court found that the parties intended that Ford make the minimum monthly payments during the term of the contract, regardless of its requirements. Upon breach of the contract, such intention to pay such stipulated sums is given effect where the damages are uncertain in nature or amount, or are difficult of ascertainment.

In Wise v. United States, 249 U.S. 361, 365, 39 S.Ct. 303, 63 L.Ed. 647, the court said:

"The subject of the interpretation of provisions for liquidated damages in contracts, as contradistinguished from such as provide for penalties, was elaborately and comprehensively considered by this court in Sun Printing & Publishing Association v. Moore, 183 U.S. 642 [22 S.Ct. 240, 46 L.Ed. 366], applied in United States v. Bethlehem Steel Co., 205 U.S. 105, [27 S.Ct. 450, 51 L.Ed. 731] and the result of the modern decisions was determined to be that in such cases courts will endeavor, by a construction of the agreement which the parties have made, to ascertain what their intention was when they inserted such a stipulation for payment, of a designated sum or upon a designated basis, for a breach of a covenant of their contract, precisely as they seek for the intention of the parties in other respects. When that intention is clearly ascertainable from the writing, effect will be given to the provision, as freely as to any other, where the damages are uncertain in nature or amount or are difficult of ascertainment or where the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression. There is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, when fairly and understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced.

"There are, no doubt, decided cases which tend to support the contention advanced by appellant, but these decisions were, for the most part, rendered at a time when courts were disposed to look upon such provisions in contracts with disfavor and to construe them strictly, if not astutely, in order that damages, even though termed liquidated, might be treated as penalities, so that only such loss as could be definitely proved could be recovered. The later rule, however, is to look with candor, if not with favor, upon such provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights, as promoting prompt performance of contracts and because adjusting in advance, and amicably, matters the settlement of which through courts would often involve difficulty, uncertainty, delay and expense.

*    *    *    *    *    *

"The parties to the contract, with full understanding of the results of delay and before differences or interested views had arisen between them, were much more competent to justly determine what the amount of damage would be, an amount necessarily largely conjectural and resting in estimate, than a court or

jury would be, directed to a conclusion, as either must be, after the event, by views and testimony derived from witnesses who would be unusual to a degree if their conclusions were not, in a measure, colored and partisan."

The large expenditures aggregating more than $163,000,000 incurred by the City in order to supply the contractual requirements of Ford, and other users of electric power, make the damages in this case uncertain in amount and difficult of ascertainment. Ford is not being penalized by being held liable for the payments it agreed to make, even though it does not take the electricity, which it agreed to purchase. The large sums of money, representing the accumulated minimum monthly bills for which Ford was indebted, according to the holding of the court, are attributable to the great amount of money invested by the City of Memphis in planning and building for Ford's needs, and in reliance upon Ford's agreement to purchase electricity at the specified rate over a five-year period. Because the amount of the indebtedness, as found by the court in the amount of $252,756.78 is, admittedly, a large sum of money, it cannot be held disproportionate to the large investment made by the City on Ford's behalf, or excessive, considering the idle capacity of the City's generating plant, resulting from Ford's voluntary cessation of business.

Under the doctrine of anticipatory breach, upon the default of Ford, this total amount became due prior to the filing of suit; and the district court was not in error in holding that the City of Memphis was entitled to recover all amounts due for minimum bills for the remainder of the contract term.

The fact that Ford sold its plant to a small firm which uses less than one-tenth of the electric power previously used by Ford does not go to diminution of damages. The new firm is served through other facilities installed especially for it, and the Ford contract was nei-ther assigned to, nor assumed by, the new firm.

In accordance with the foregoing, the judgment of the district court is affirmed.