WILLIAM K. DICK ET AL., EXECUTORS OF J. HENRY DICK, DE-
CEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT.

JULIA T. DICK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVE-
NUE, RESPONDENT.

Docket Nos. 16495, 24521.   Promulgated September 3, 1930.

*Edward H. Green, Esq.*, for the petitioner.
*Eugene Meacham, Esq.*, for the respondent.

OPINION.

Morris: The first question presented is the correctness of respondent's computation of the losses sustained as a result of sales of preferred and common shares of stock of the Cuban-Dominican Sugar Co. The undisputed facts are taken from the pleadings and documentary evidence, the more important of which are the syndicate agreement, the plan for liquidation of the syndicate and organization of the successor corporation and the revenue agent's report.

The petitioners contend that certain amounts were paid in to the syndicate, which was terminated and dissolved in 1922; that a certain number of shares of preferred and common stock of the Cuban-Dominican Sugar Co. were received therefor; that this constituted a closed and completed transaction; that they are entitled to deduct a resulting loss suffered, measured by the difference between the said amounts paid in to the syndicate, and the market value of the corporate stock and, furthermore, that a new basis was thereby established for the computation of the losses alleged to have been sustained upon subsequent sales. Since both of these transactions occurred in 1922, the obvious effect of this contention, if sustained, would be to grant deductions for two separate and distinct losses. The respondent contends, on the other hand, that the exchange of stock upon dissolution of the syndicate for the decedent's interest in said syndicate resulted in no gain or loss whatsoever, notwithstanding the stock so received

had a market value, and he urges section 202 (c) (3) of the Revenue Act of 1921 in support thereof, which reads as follows:

(c) For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

\* \* \* \* \* \* \*

(3) When (A) a person transfers any property, real, personal or mixed, to a corporation, and immediately after the transfer is in control of such corporation, or (B) two or more persons transfer any such property to a corporation, and immediately after the transfer are in control of such corporation, and the amounts of stock, securities, or both, received by such persons are in substantially the same proportion as their interests in the property before such transfer. For the purposes of this paragraph, a person is, or two or more persons are, " in control " of a corporation when owning at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

In order to reconcile the views of the opposing parties and determine the issue presented, it would seem highly necessary to first ascertain the true nature of the syndicate itself and the relationship of the so-called " Syndicate Managers " to the " Subscribers," that is, whether there was a relationship of principal and agent because of which we should conclude that all of the acts of the syndicate and the managers thereof were in legal effect the acts of the subscribers themselves for the purpose of taxation, or whether the syndicate, as such, and the managers thereof, must be regarded as a separate and distinct entity, entirely apart from the subscribers thereto.

Webster's New International Dictionary defines a syndicate to be:

1. The office or jurisdiction of a syndic; a council, or body of syndics.

2. An association of persons officially authorized to undertake some duty or to negotiate some business.

3. An association or group of persons, usually financiers or capitalists, who combine to carry out, on their own account, a financial or industrial project \* \* \* etc. The members may be partners, joint contractors, or in any legal relation agreed upon.

A " syndic " referred to in the above definition is defined, among other things, to mean " an agent of a corporation or of any body of men engaged in a business enterprise."

In *Gates* v. *Megargel*, 266 Fed. 811; certiorari denied, 254 U. S. 639, which was an action for accounting by subscribers to a syndicate against the syndicate managers to compel said managers to account for secret profits, the court held that " The promoter of a syndicate, which is an organization formed for some temporary purpose, has duties of a fiduciary, agent, or trustee to the subscribers of the syndicate," and it further held, referring to the syndicate agreement, that " Such a document especially invites application of the

rule that a writing is to be interpreted in the sense in which the maker knew or had reason to know it would be understood by the party to whom he tendered it."

Although we believe there is ample reason for holding that the parties created a relationship of principal and agent by the general tenor of the agreement which they entered into, we are not compelled to rely upon a mere interpretation of the general language used, nor must we resort to inferences in order to ascertain what the parties intended or what their true relationship was. The so-called syndicate agreement here in question was entered into between Potter Brothers & Co. and the West India Sugar Finance Corporation, on the one hand, designated therein as "managers," and the "subscribers," on the other, designated as participants in the syndicate, and, according to the agreement, "each of whom is hereinafter termed 'subscriber,' and all of whom, together with the managers, constitute the Syndicate." That agreement specifically provided that nothing contained therein should "constitute the Subscribers partners with or agents for one another or with or for the Managers, or render any Subscriber or Subscribers liable to contribute in any event more than the ratable amount of his subscription as aforesaid," but in the fourth numbered paragraph of the syndicate agreement it was provided that "The Subscribers nominate and appoint the Syndicate Managers their attorneys and agents with full power and authority to enter into contracts for and to purchase all or a majority * * * of the * * * capital stock of any corporation or corporations in which the titles to the aforesaid sugar estates or any part of them may now or hereafter be vested * * *."

We are of the opinion, therefore, that by their express understanding, as set forth in the syndicate agreement entered into, the relationship of the subscribers and the syndicate managers was that of principal and agent, and that in considering the issue presented, that well settled maxim of the law of agency, *qui facit per alium, facit per se,* should control. In other words, the subscribers and managers composed and were in fact *the* syndicate. In order that the purpose for which the syndicate was formed might be more readily accomplished, managers were designated and expressly empowered to perform certain acts as "attorneys and agents" for the subscribers. We believe, therefore, that we should view each of the various acts performed by the managers as the acts of the subscribers themselves and not in the relationship of separate and distinct entities as in the case of stockholders and corporation.

The syndicate was organized for the purpose of acquiring all or a majority of the capital stock of certain sugar interests in the Dominican Republic and the Republic of Cuba, and the petitioners became subscribers to the syndicate in 1920 and from time to time

paid therein certain amounts. In 1922 it was decided to organize a corporation, known as the Cuban-Dominican Sugar Co., to acquire the assets of and to liquidate the syndicate. In exchange for the syndicate's assets the corporation was to deliver to the syndicate managers 82,012.2 shares of preferred and 1,046,164 shares of common stock of the total 83,000 shares and 1,100,000 shares of preferred and common, respectively. Thus it will be seen, regarding the action of the syndicate as that of the subscribers themselves, that the subscribers were " in control " of the corporation immediately after said exchange was effected, within the meaning of section 202 (c) (3), *supra*, having acquired considerably more than " 80 per centum " of both the preferred and common stocks of the corporation, and that no gain or loss should be recognized by reason of this acquisition or exchange of syndicate assets for corporate stock. Therefore, the respondent correctly held that the basis for computing gain or loss was the original cost.

Needless to say, we have read the petitioners' brief and have carefully studied the arguments urged therein in support of their contentions, all of which we believe faulty, in that they begin with the false premise that the syndicate and the syndicate managers were a separate entity from the subscribers thereto, which, as we have already endeavored to make clear, is incorrect. For instance, anticipating that the respondent would urge the particular theory of the case which we have advanced here in support of the conclusion reached, the petitioners contend that section 202 (c) (3), *supra*, has no application, because the transfer to the corporation was made by the syndicate managers in exchange for stock and not by the subscribers. If (the petitioners state) that section of the law is controlling at all, it can apply to that particular transfer only. In this respect we entirely agree with the argument of the petitioners, and it is that transaction to which we have applied that section, but we do not concur in the argument that any effect should be given to the transaction whereby the syndicate distributed the stock which it received from the corporation to the syndicate subscribers, for the reasons set forth in support of our conclusion. That distribution added nothing to the property rights of the subscribers not already enjoyed by the original acquisition by the syndicate, except possibly the physical possession of the stock certificates.

In our view of the case it is unnecessary to answer the petitioners' argument that the record does not disclose that the previous members of the syndicate became the owners of over 80 per cent of the stock of the corporation because, as we have shown, it was they who in legal effect acquired the stock at the outset, and it was they who at that time were in control of the corporation through the ownership of

more than 80 per centum of its capital stock. Nor do we consider it necessary, for very obvious reasons, to discuss the argument advanced that the transaction was closed and completed when the syndicate was dissolved and the stock distributed.

The second question relates to Docket No. 16495 only, and involves the purchase and sale of stock in the West India Sugar Finance Co. In September, 1913, J. Henry Dick bought 200 shares of stock in the West India Co. for $20,000. Thereafter he acquired by the exercise of rights which the corporation gave him 252 additional shares for $25,200, and on August 9, 1920, he acquired, by the exercise of rights, 148 shares at a purchase price of $59,200, making a total of 600 shares that had cost $104,400. During December, 1920, he received $2,306.37 as a liquidating dividend.

In 1922 J. Henry Dick sold 100 shares of the West India Co. stock for $6,500. Respondent computed his loss on the basis of a cost of $100 per share and allowed a loss of $3,500 on the sale. Petitioner claims that the net cost should be divided by the 600 shares acquired, which gives a cost per share of $170.156, and that the loss sustained on the sale of the 100 shares was $10,515.60.

It is our opinion that the respondent's computation is erroneous, and that the loss should be computed by taking the total cost less the liquidating dividends, and dividing this figure by the number of shares so as to determine the average cost per share. *Miles* v. *Safe Deposit Co.*, 259 U. S. 247. This computation results in an average cost per share of $170.15605, or a cost of $17,015.60 for 100 shares. Thus at a sale price of $6,500, J. Henry Dick sustained a loss upon the sale of his 100 shares of $10,515.60.

*Judgment will be entered under Rule 50.*