**LAMMERDING v. HELVERING, Commissioner of Internal Revenue.**

**HILDICK v. SAME (two cases).**

**Nos. 7592–7594.**

United States Court of Appeals for the District of Columbia.

Decided April 28, 1941.

Joseph Bohrer, of Newark, N. J., for petitioners.

Joseph M. Jones, Sp. Asst. to Atty. Gen., and J. P. Wenchel and Robert L. Williams, both of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

VINSON, Associate Justice.

Helen A. K. Hildick, Walter H. Hildick, Jr., and Kathryn Lammerding, petitioners, are, in the order named, the wife, son, and daughter of Walter H. Hildick (Hildick). The petitioners in January, February, and December, 1932, loaned Hildick $5,471.55, $1,500, and $4,000, respectively. No definite time for the payment of the loans was set. Helen A. K. Hildick received two demand notes; Walter H. Hildick, Jr., received a note; neither received any security. Kathryn Lammerding received neither note nor security.

These loans and one made by Roth, a business associate, enabled Hildick to buy at a receiver's sale in February or March, 1932, for $15,025, the plants of a cider and vinegar company in which he had been president and principal stockholder, and to continue that business until September, 1933. Then he transferred the plants to a newly formed corporation interested in the manufacture of apple brandy. He was also president of the new corporation. In return Hildick received 32,000 shares of stock and 35,000 purchase warrants. It is agreed that the cost of the stock was 40%10 cents per share. At this time Hildick decided that his wife should receive 2,000 shares in payment of her loan, his son 500, and his daughter, 1,000. These were mental transactions. There were no actual segregations. Petitioners were told that some stock had been set aside for them. No reason is revealed for picking these amounts. The apparently arbitrary value of the stock that Hildick mentally set aside

for his wife was about $3 per share, his son about $3.60, and his daughter about $4.50. These values, it seems, roughly approximate the worth of the stock based upon the appraisal of the plants when they were turned over to the new corporation. The appraisal and the basis upon which it was figured do not appear of record. At what time Hildick mentally set aside or transferred the stock to Roth, the business associate, is not shown, but that stock was valued at something over $12.50 per share, probably approximating the market value.

The stock was not transferred to the petitioners at the time Hildick decided upon the amounts, because he was under a restrictive agreement prohibiting all types of disposal until April 15, 1934. At the termination of this restrictive agreement the market was declining so Hildick entered into another restrictive agreement with Richard Whitney & Co., not to transfer any of his stock while they were trying to make a market. On May 31, 1934, the 3,500 shares were transferred on the records of the corporation. The wife knew of this transfer at the time. It is not shown just when the daughter and son learned of the transfer.

After the transfer to the petitioners, Hildick kept the stock in his safe deposit box and none of the recipients saw the stock until a year or two later. The petitioners sold all of their stock in 1936 for around $11 per share. Except for 1,500 of his wife's shares, Hildick made the sales.

The stock was offered to the public in October, 1933, and it was readily subscribed for at a price of $15 per share. At the turn of the year the stock was selling for about $13. In the early part of May, 1934, the price was $31 and $32 per share. By the end of the month it had declined to $25 and $26.

The question is, upon these facts, did the petitioners receive taxable income in 1934?

A revenue agent made an assessment for 1934 using the book value of the stock, $11.93 per share. The petitioners filed waivers of restrictions on assessments and collection of deficiencies. The Commissioner subsequently assessed deficiencies evaluating the stock at $26⅛. This figure was arrived at by taking the average of $25 and $27¼, the low and high of the market quotations for the week in which the transfer was recorded on the books of the corporation.

The Board, in its decision, states that the petitioners contended that the excess value of the stock over the amount of the loans was not taxable income, but rather a gift, and that when the stock was put in their names on May 31, 1934, it did not become theirs, nor did it have a fair market value of $26⅛.

The Board determined that the nature of the transactions, shown by the facts that we have set out and an excerpt from a letter written by Hildick to an Internal Revenue Agent, to wit: "At the time these loans were made there was an understanding that interest would be paid at 6% per annum and that each lender would participate in any profits arising from the operation or sale of the properties acquired", was a settlement of a loan and not a gift.[1] The Board added that the method of paying the loan out of possible profits was in the nature of a joint venture. In respect of the other issue the Board stated that the transfer on the records constituted the time of the delivery of the stock and the payment of the loan in the absence of countervailing evidence. It decided that the petitioners had failed to show that Hildick retained dominion over the stock after May 31, 1934, and the evidence was indicative that the petitioners became the owners at that time as revealed, for example, by Hildick's statement that, in 1936, "I sold the stock of my son and daughter * * * and I sold five hundred shares of stock belonging to my wife." The Board holding that there was taxable income in 1934, approved the evaluation of $26⅛, and entered a decision in favor of the Commissioner.

The petitioners, picking up the Board's language of joint venture, now contend, ingenuously, that the money was put into a common enterprise that only stock was received in exchange for their property, that after the exchange, they with Hildick and Roth were in control of the new corporation, and therefore, no gain or loss is recognizable under Section 112(b) (5).[2] They contend that whenever the stock was

---

[1] Compare Davis v. Com'r of Internal Revenue, 6 Cir., 81 F.2d 137.

[2] The Commissioner taxed the petitioners under the Revenue Act of 1934. The petitioners suggest that the stock was divided among the joint venturers in September 1933. At this time the Revenue Act of 1932 was in force. Section 112(b) (5) is the same in both acts, 26 U.S.C.A. Int.Rev.Acts, pages 511, 692.

turned over to them, it was merely their division in the joint venture and that they realized no taxable income until they sold. They also contend that the Board erred in finding that they had failed to show that Hildick retained dominion over the stock after May 31, 1934.

In developing this latter contention, however, the petitioners concede that the legal title was transferred to them on May 31, 1934, and that they acquiesced in whatever dominion Hildick exercised over the stock after that date. Hence, the whole argument of the petitioners before us simmers down to whether Section 112(b) (5) is applicable. If it is, the petitioners did not receive taxable income until 1936 when they sold the stock, and they now ask that they be taxed in that year. If it is not, they have in effect conceded that there is taxable income in 1934.

■ The Board's attention was not directed to, nor did it have any occasion to consider, Section 112(b) (5) in view of the issues posed before it. Nonetheless, we see no reason to remand the case in order that the record may be built on this issue or to have the Board give deliberation to the present contention.[3] Whether Section 112 (b) (5) is applicable is a question of law or at most mixed law and fact upon which we are free to pass judgment even though the Board was not called upon, nor did in fact, express any conclusion. Moreover, the contention is inconsistent with the findings and conclusions of the Board.

■ The evidence, and the facts upon which petitioners rely, while lacking the specificity that might be expected, are incompatible with their new contention. According to petitioners' contention, they, Roth, and Hildick were the joint venturers contributing the property that launched the new corporation. This property was exchanged for stock. After the exchange they, Roth, and Hildick were in sole control. Later there was a division of shares among the joint venturers, and their profit became recognizable only when they sold their stock. Section 112(b) (5) is not written in terms of joint venturers, but relates to the transaction where property is exchanged for stock alone, and after the exchange such *stockholder* or stockholders are in control, and concludes with these significant words, *"but in the case of an exchange by two or more persons* this paragraph shall apply only if the amount of the stock and securities received by each is *substantially in proportion to his interest in the property prior to the exchange."* (Italics supplied)

Here, the cost of the stock involved in the exchange was 40⁹⁄10 cents per share. The stock that his wife received was valued by Hildick at about $3 per share. The stock that his son received was valued by him at about $3.60 per share. The stock that his daughter received was valued by him at about $4.50 per share. The stock that his business associate received was valued at something over $12.50 per share. The petitioners and Roth put up $12,221.55, more than ⅘ths of the purchase price of the plants, $15,025, which later were exchanged for the stock in the new corporation. They received 3,600 shares while Hildick retained 28,400 shares in addition to 35,000 purchase warrants. No additional money contributions by any of the parties, nor any evaluation or agreement in respect of Hildick's services is shown. Thus we cannot say that "the stock and securities received by each [was] substantially in proportion to his interest in the property prior to the exchange."[4]

Thus far it has been assumed that each petitioner had "his interest in the property". To establish their interest in the property, the petitioners are trying to connect and explain all of their transactions with Hildick under the idea of a joint venture—an idea which was gathered from the language of the Board's opinion. It must be remembered that the Board did not find this business relationship to be a joint venture; it merely made reference to a joint venture by way of differentiating the liberal payment of a loan from a gift.

---

[3] Compare Hormel v. Helvering, 61 S. Ct. 719, 85 L.Ed. ——, decided March 17, 1941. Contrast General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154, and Helvering v. Wood, 309 U.S. 344, 60 S.Ct. 551, 84 L.Ed. 796.

[4] Compare Elmore Milling Co. v. Helvering, 27 B.T.A. 84; Id., 63 App.D.C. 132, 70 F.2d 736. Contrast Dick v. Com'r of Internal Revenue, 20 B.T.A. 637; Kierulff v. Com'r of Internal Revenue, 21 B.T.A. 254; and Straubel v. Com'r of Internal Revenue, 29 B.T.A. 516.

This record simply does not support a joint venture interpretation.[5] The lack of proportion in the exchange, set out above, shows that. Each petitioner in his testimony spoke of a loan to Hildick. Hildick stated that he borrowed the money. He refers to "my business." After the purchase of the plants, the purpose for which the money was borrowed, Hildick ran the cider and vinegar business until September, 1933. A second loan was made by the wife after the plants had been purchased; there was no new agreement, as there never was any previous or subsequent agreement, of the extent that each "adventurer" was in on the "joint business". Hildick received all of the new corporation stock that was exchanged for the plants. He decided how much would be set aside for the other "joint venturers". In making this determination he took into account the principal of the loans, the interest, and his individual desire of the extent each petitioner should share in the profits. He thereupon told petitioners that *some* stock had been set aside for them. Joint venture used in a loose sense may describe the manner in which the amount of the loan payments were determined, but the use of joint venture in a strict sense to mean that each had "his interest in the property" under Section 112(b) (5) will not do. A study of the record convinces us that the joint venture interpretation does not approach plausibility, but the conclusion that Hildick was the entrepreneur, that he liberally repaid the loans that his family made according to his wishes, and that he repaid his business associate's loan fully but not so generously as those of his family becomes overwhelming. Section 112(b) (5) does not cover a situation like this.

Affirmed.

---

[5] Contrast the entirely different situation in McCausey v. Burnet, 60 App.D.C. 201, 50 F.2d 491, upon which petitioners rely. See footnote 4.